UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

JAMES E. CLARK and           )
LAKEISHA CLARK,              )
                            )
        Plaintiffs,          )
                            )
v.                          )   No.: 3:12-CV-72-PLR-CCS
                            )
G4S GOVERNMENT SOLUTIONS, INC.,   )
d/b/a WSI OAK RIDGE,        )
                            )
        Defendant.           )

## MEMORANDUM OPINION

Plaintiffs James Clark and LaKeisha Clark are husband and wife. They are former employees of Defendant WSI Oak Ridge and bring this action, *pro se*, alleging that they suffered discrimination during their employment with WSI Oak Ridge and were terminated in retaliation for reporting discrimination at WSI Oak Ridge. Before the court is Defendant's motion for summary judgment, to which Plaintiffs have responded. The Court has carefully considered the parties' pleadings and supporting documents, all in light of the controlling law. For the reasons which follow, Defendant's motion for summary judgment is **GRANTED** and this action is **DISMISSED.**

I.      **Background**

Between January 10, 2000 and August 8, 2012, Defendant WSI Oak Ridge was the prime contractor providing security and related support services at the Y-12 National

Security Complex ("Y-12") under contract with the National Nuclear Security Administration. From August 8, 2012 through October 29, 2012, Defendant performed these services under a sub-contract with B&W Y-12, LLC, operating contractor at Y-12.

LaKeisha Clark was hired by Defendant as a Security Police Officer ("SPO") at Y-12 on March 5, 2001. She was promoted to Central Alarm Station Operator ("CAS") and received a substantial raise on August 4, 2003. On July 5, 2006, LaKeisha Clark voluntarily resigned her employment for personal reasons. On January 26, 2007, LaKeisha Clark sought re-employment with Defendant. On March 7, 2007, Defendant offered LaKeisha Clark a vacant SPO position, which she accepted. While this job offer was outstanding and before she began work on April 30, 2007, a higher level CAS Operator position became available. Clark preferred the CAS Operator position and sent Senior Vice President and General Manager, John Burleson an e-mail on April 18, 2007, asking him to consider her for the CAS Operator vacancy. The CAS Operator position carried a 20% pay raise over the SPO position. Clark was offered and she accepted the CAS Operator position. On July 21, 2008, LaKeisha was promoted to Sergeant with a 12% pay raise. She remained as a Sergeant at Y-12 until her September 16, 2009 termination.

James Clark was employed by WSI and its predecessor contractors at Y-12 from February 1989 until his termination on October 6, 2009. At the time James Clark became an employee of WSI on January 10, 2000, he was a Section Commander. Clark was promoted to Captain in August 2002, making him one of only six Captains employed by Defendant at Y-12. He remained a Captain until his termination. During his employment

2

with Defendant, James Clark received high performance ratings and above-average raises.

During his tenure at WSI, James Clark filed three EEOC charges and one lawsuit related to race discrimination and retaliation. His first EEOC charge was filed June 16, 2000, less than six months after he was hired, alleging race discrimination in "promotions, opportunities, advancements, job and work assignments . . . [and] training." The job assignments that he alleged he was denied included "being allowed to work up to Captain" and working "special assignments." The only training which he could identify that he was denied was "sniper training."

On October 22, 2001, James Clark (and six other WSI employees) filed a Title VII race discrimination action in this Court. On July 12, 2007, Judge Thomas W. Phillips granted WSI's motion for summary judgment dismissing James Clark's claims. Clark appealed and the Sixth Circuit Court of Appeals affirmed the District Court's dismissal of the case on July 25, 2008.

Meanwhile, James Clark filed a second EEOC charge on December 7, 2007, alleging race discrimination and retaliation in the denial of a promotion that been given to a white male. The EEOC charge made no mention of discrimination or retaliation in training or job assignments. On August 20, 2008, his second charge was dismissed by the EEOC and Clark decided not to file suit on that charge.

James Clark's third and final EEOC charge was filed on February 17, 2010, challenging his termination on October 6, 2009. Clark alleges:

I was terminated on October 6, 2009 for allegedly violating the company workplace harassment policy. This charge is false and has no basis in fact. I was terminated by Gary Brandon, a white male. I believe I was terminated for discriminatory reasons because I am an African American who has participated in and made prior EEOC claims against the company; because I have been treated less favorably then similarly situated white males and/or females; and have participated in prior protected activities.

There is no reference in the February 17, 2010 charge to discrimination or retaliation in training and/or job assignments. Clark received the notice of dismissal from the EEOC on November 18, 2011, and filed the original complaint on February 14, 2012. On February 21, 2012, Plaintiffs filed an amended complaint.

The record shows that throughout the foregoing protected activities, WSI treated James Clark favorably in promotions, performance evaluations, and annual raises. He competed with a number of other applicants and was awarded the Captain position in August 2002, two years after filing an EEOC charge and about a year after filing a lawsuit against WSI. After being promoted to Captain, Clark received a rating of 4.1 (out of a possible 5) on his 2003 annual performance appraisal. He received additional high performance ratings and substantial pay increases in each of the succeeding years: 4.2 for 2004; 4.0 in 2005 with a 3.8% merit increase; 4.008 in 2006 with a 3.7% merit increase; 4.09 in 2007 with a 3.5% merit increase; and 4.4 in 2008 with a 4% merit increase. Clark acknowledges a rating of 4.0 or above is a "very positive rating." The 4.4 rating he received in 2008 was his highest score ever, and he was satisfied with both the rating and the 4% merit increase.

Clark alleges that he "has been denied training due to his race." He asserts that as a result of filing an EEOC charge over the denial of training, WSI retaliated against him

4

by denying him "work assignments" and "not providing him with an Independent Development Plan." Clark testified that his "work assignment" claim involved, "Not allowing me to work job assignments that was higher than my rank in order to get experience I need to be able to be promoted to those positions." The only specifics Clark could provide with respect to work assignments he was denied was "work in the major's position [and] we get a lot of special details."

WSI has never offered any plan or program referred to as an "Independent Development Plan." Clark testified that in using the term "Independent Development Plan," he was referring to supervisory input on his annual performance appraisals. Clark admits that there is an area in his annual performance appraisals to request areas for professional growth and training, but he failed to do so, believing it "was a waste of paper." Clark does not recall ever requesting additional training in any of his performance appraisals between 2001 and 2008. Clark concedes that his allegations about an Independent Development Plan are part of his complaint about not being given training or special assignments which he alleges had a negative impact on his prospects for promotion.

Clark concedes that the only EEOC charge that refers to training or job assignments is his first charge filed in August 2000. He filed suit on that charge in December 2001, and the suit was ultimately dismissed. His second EEOC charge complained about a single promotion, and he did not file suit on it after receiving the right to sue notice from the EEOC. His third charge, which forms the administrative

prerequisite for the instant suit, relates solely to his October 2009 termination. The charge contains no reference to training or job assignments.

### A. Allegations Concerning LaKeisha Clark

Since beginning operations in January 2000, WSI implemented a number of policies strictly prohibiting violence or threats of violence in the workplace. Company Policy P520-002 strictly prohibits harassing fellow employees or using violent or threating behavior towards a fellow employee. Company Policy P520-003 adopts a zero tolerance for violence in the workplace. Specific examples of conduct that are considered threats or acts of violence include threatening to harm an individual or making a credible threat with intent to place the other person in reasonable fear for his or her safety. Violations of the policy by any employee would result in disciplinary action up to and including termination of employment.

On September 8, 2009, Mary Patterson and her union representative reported to WSI that Patterson's superior, Sgt. LaKeisha Clark, had threatened Patterson with physical violence that morning while they were donning their uniforms in the Y-12 women's change house. That same day, WSI commenced an investigation of Patterson's claim. LaKeisha Clark was interviewed. Priscilla Kingry took notes of the interview as follows:

> Sgt. Clark said that her husband had recently told her that he and Ms. Patterson were "fooling around" at work. I asked what she meant by "fooling around." She said that there had been touching and kissing.

> She confronted Ms. Patterson at that time, to ask her about her involvement with James. Ms. Patterson told her that James had given her "hugs and stuff" when she was on C shift.

Today, when Sgt. Clark saw Ms. Patterson in the women's change house, she asked her if she was ready to tell the truth about her involvement with James. Ms. Patterson responded that she had already told the truth.

Sgt. Clark said that Ms. Patterson then told her information that she hadn't heard before, that [James] Clark has been calling her at home and that he forced her into a room at work, and had kissed her. Sgt. Clark said, "That's not my husband, he's not aggressive like that." She said she told Ms. Patterson they could take it to Mitchell Road to get to the truth. Ms. Patterson said that would be fine if she wanted to make a threat. Sgt. Clark responded, "If you don't shut up, I'll break your fucking neck." Ms. Patterson started to respond and Sgt. Clark said, "Just shut up, don't talk to me anymore."

LaKeisha Clark was asked what prompted her outburst, and she replied "Seeing [Patterson] in there." LaKeisha was suspended without pay after the interview.

Patterson told WSI that she told LaKeisha Clark "that one night at work [James] Clark had pushed her into an office and kissed her and that was the reason she had left C shift." Patterson reported that LaKeisha became upset with her and claimed that her husband "wouldn't behave that way." According to Patterson, LaKeisha said she would take Patterson to Mitchell Road (WSI headquarters) and "they do polygraphs," to which Patterson responded, "that was fine, that she knew the truth." Patterson said she then walked away to her locker. Patterson described what happened next as follows: "She told Sgt. Clark that she didn't know the truth, that she wasn't there that night [when James Clark had kissed her]." Patterson told the investigators Sgt. Clark then came forward toward her and pointed her finger at her and said, "Shut the fuck up, I'll break your fucking neck," then walked out. Patterson notified her union representative who notified WSI. Patterson told the investigators that she was very upset by the confrontation.

7

There were two witnesses to the incident, Security Officer Jamie Love and SPO Tracey Whaley.  Love reported she heard Patterson say, "I've done nothing wrong," to which Clark replied, "I'll take you to Mitchell Road."  She then heard Clark tell Patterson she would break her neck.  She said Clark was using profanity and was not screaming, but was confrontational.

Whaley reported, "At first Sgt. Clark and Ms. Patterson were both at the sinks, then Ms. Patterson walked past Ms. Whaley to go to her locker."  Whaley reported that Clark then walked toward Patterson and told Patterson to "Shut the fuck up, I will break your fucking neck."

All witnesses submitted written statements to WSI.  LaKeisha Clark wrote, "I told her that obviously somebody is lying and we could talk about it at Mitchell Road if she wasn't willing to talk there."  Patterson said, "That's okay if your want to make threats." I said, "I'm not making a threat, but I promise I will break your fucking neck if I have to."

The interviewers concluded that LaKeisha Clark's threat to break Patterson's neck violated WSI's policy prohibiting using violent or threatening behavior towards a fellow employee.  They also concluded that Clark's threat violated WSI's policy against violence in the workplace.  Ultimately, the investigation team determined that LaKeisha Clark had made a verbal threat of physical violence (using profanity) when she confronted Patterson in the Y-12 women's change house on September 8, 2009.  WSI states that neither Clark's race nor her gender had any role in either the company's decision to investigate the incident or in the findings of the investigators.

8

The investigation team prepared its report and briefed WSI's General Manager. The investigation team recommended that LaKeisha Clark be terminated. WSI's Senior Vice President and General Manager, John Burleson concurred. Ultimately, WSI terminated Clark on September 16, 2009.

Once Patterson told the WSI investigators about the underlying allegations that James Clark had pushed her into an office and forcibly kissed her against her will, WSI commenced an investigation into Patterson's allegations against James Clark. WSI's guard force at Y-12 is heavily armed. Given the serious nature of Patterson's allegations against James Clark, WSI ordered Clark to be disarmed and suspended without pay.

On September 11, 2009, James Clark filed an "employee concern" form over Patterson's allegations and his suspension. Clark claimed that Patterson's sexual harassment allegations were "false" and constituted "defamation of character." His suggested resolution was "to immediately be placed back to work," with an "apology from false accuser." Clark wanted payment for all lost wages and "suggested polygraph test on Patterson and any other factitious witness." The investigation team considered Clark's employee concern submission as a part of the overall investigation into Patterson's allegations. WSI states it did not routinely offer or require polygraphs in workplace misconduct investigations.

### B. Allegations Concerning James Clark

Since beginning operations in January 2000, WSI has published a Workplace Harassment Policy, Policy No. P520-007. The Harassment Policy defines sexual harassment as follows:

9

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature when (1) the submission to such conduct is either explicitly or implicitly made a term or condition of one's employment; (2) submission to or rejection of such conduct is used as the basis for an employment decision affecting an individual; or (3) such conduct has the purpose or effect of interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

The Harassment Policy further defines sexual harassment to include "requests for sexual favors" and "unwanted physical contact, including touching, pinching, assault, touching the body, and coerced sexual intercourse." Failure to adhere to the Harassment Policy would be cause for disciplinary action up to and including termination. WSI conducted periodic training on its Harassment Policy. Clark last received harassment training on June 1, 2008 and was current in his training at the time of his termination.

Discipline for violating the Harassment Policy is addressed in Section E as follows:

All employees must avoid any action or conduct that might be viewed as workplace harassment. Approval of, participation in, or acquiescence in, conduct constituting workplace harassment is a violation of this policy and cause for serious disciplinary action, up to and including termination.

Patterson's allegations concerned events that occurred on "C shift" between November 2005 and March 2006, while James Clark was the overall Commander. At the time of the harassment, Patterson was a new hire who, after her initial training in October 2005, was assigned to C shift in November 2005. James Clark was a Captain, three levels of supervision above Patterson.

The most egregious incident, which involved Clark forcibly kissing Patterson against her will, occurred in late November or early December 2005. Patterson

ultimately sought a transfer from C shift to D shift to get away from Clark. She was able to transfer to an open position on D shift in March 2006.

The investigation team asked Patterson why she had not previously brought these allegations to WSI's attention. Patterson explained that "she was new and young and did not want to cause any trouble." She also stated that she did not feel that she would be believed as "he was a Captain and she was a new employee." Patterson described in detail a pattern of harassment by James Clark that occurred while she worked under his ultimate supervision. The investigation team interviewed Patterson three times, Clark two times, and sixteen other individuals who were identified as witnesses by Patterson or Clark. The investigation team took written statements from all eighteen witnesses.

Patterson reported that before she was transferred to C shift, during October 2005, she received a number of calls from James Clark engaging her in small talk unrelated to work. After her transfer to C shift in November 2005, she stated that Clark began seeking her out at her posts to the point that it was noticed by her co-workers. Patterson reported that Clark asked her repeatedly to eat lunch with him. One night, while she was outside of Cathy Lemmond's office, Clark pushed her into the office and kissed her. Patterson reported that Clark told her, "I've wanted this for a long time." She said he told her, "I'd really like to fuck you. I'd like to know what you feel like." Patterson stated that she did not reciprocate and quickly left the office. James Clark admits kissing Patterson but contends it was consensual.

Patterson also told investigators that Clark had encouraged her to apply for promotions, telling her that he could help her. After she was not promoted, he told her

11

that she "just wasn't sleeping with the right people." Clark once asked Dale Carroll (Patterson's partner) "Have you got any of that," or "Have you hit that?" referring to Patterson.

Patterson stated that Clark told her that he "didn't mess with people he couldn't trust" and that "he knew that he could trust" her. Patterson interpreted this as meaning that he knew she wouldn't talk about what he was saying and doing. In August 2008, Clark called Patterson and told her that he and his wife were fighting. He asked Patterson not to tell his wife anything if she called.

The investigators interviewed SPO Jennifer Seiber on two occasions. She related that on one occasion, on the midnight shift, she was returning to guard headquarters, passing between two vehicles when she saw James Clark pinning Patterson up against a Chevrolet Tahoe. Seiber reported that Clark was standing in front of Patterson with his hands on either side of her. She stated that Patterson looked "pinned" and looked like she wanted help but did not say anything. Patterson subsequently told Seiber that Clark "just wouldn't leave her alone."

On a second occasion, Seiber saw Clark with Patterson up against a wall in guard headquarters. Seiber told the investigators, "He was very close to her, she was not obviously pinned, but Ms. Patterson looked clearly uncomfortable." When asked if Patterson had said anything to her about what had happened that night, Seiber recalled that, "Ms. Patterson said something about Capt. Clark either trying to kiss her or hug her." Seiber stated that in her opinion, Clark was definitely pursuing Patterson.

Seiber recounted to the investigators separate incidences where Clark had made inappropriately sexually-tinged comments towards Seiber herself. Seiber reported that while in the Beta 9 office, Clark told her she had a "ghetto butt." Seiber also reported that on several occasions, Clark told her "If you wasn't married, you'd be mine." Seiber testified in her deposition that she responded, "No, I wouldn't," but he just kept making the comments. Seiber also testified that these remarks occurred on more than one occasion and that she "just tried to avoid [Clark], because I needed my job and [he was] a Captain." Seiber further testified that Clark regularly flirted with attractive female employees and treated them differently than other employees.

SPO Jamie Stiles was also interviewed. Stiles stated that on the night of the kissing incident, while working at the same post as Patterson, he went to headquarters. Stiles reported that when Patterson returned she was visibly disturbed. Patterson told him that Clark had pushed her into an office and "rubbed up on her." Stiles suggested that Patterson needed to tell somebody, but Patterson said she did not think anyone would believe her because she was a new SPO making a claim against a veteran Captain.

Sgt. Virgil Hester told the investigators that while Patterson worked with him in 2006 and 2007, she confided that Clark had "forced her into an office and tried to make out with her." Hester also urged her to report the incident, but, again, Patterson said it was her word against that of a twenty-year Y-12 veteran employee in a supervisory position, and she "knew who they would believe." According to Hester, Patterson told him that she did not want to be labeled as a troublemaker and asked him not to discuss the incident.

13

SPO Kelly Beavers told investigators that prior to the September 8, 2009 incident (confrontation with LaKeisha), Patterson had confided that while she was working on C shift, Clark pushed her into a room and tried to kiss her. SPO Richard Van Hoose reported that about three years earlier, Patterson told him about the incident of Clark pushing her into an office and kissing her and that's why she asked to leave C shift. Van Hoose advised Patterson to report the incident, but she declined out of fear for her job.

After gathering these statements, the investigation team met with Clark on September 16, 2009 to give him an opportunity to address the allegations against him. Clark denied calling Patterson to discuss non-work-related matters. Instead, he claimed she winked and flirted with him and commonly talked about sexual things. He claimed she was talking about prostate cancer and erections in Beta 9 in front of witnesses (Kendall Hill, Dan Veler, and Jacob Stooksbury). He claimed while Patterson was new on the shift, she followed him into the scheduling office, and he kissed her when she leaned into his face. Clark claimed he was glad when Patterson left his shift because "she was harassing him."

Clark admitted telling his wife, LaKeisha, that he had kissed Patterson. He told Patterson that if LaKeisha "asked her about anything," then "don't say anything about what we did." He admitted kissing Patterson in Lemmond's office, but said it was consensual and that she "didn't appear to be upset." Clark told the investigators that the two incidents described by Seiber "never happened." When asked for any witnesses who would back up his story, Clark offered Kelly Beavers, Bobby Parker, Michael Moye, Jacob Stooksbury, Dan Veler, Brad Bishop, and Michael Bunting.

14

The investigation team interviewed each of Clark's witnesses. None of them backed up his claim that Patterson was flirtatious, frequently spoke of sexual matters, or was otherwise welcoming his advances. Bunting said he never heard Patterson making sexual remarks. He said that Patterson "is not flirtatious and that she is outgoing."

Stooksbury said that Patterson's discussion of prostate cancer was all medical and not vulgar, and that it was Clark who said, "I hope I don't have to have that kind of operation. Mine would work no matter what." According to Stooksbury, it was Clark, not Patterson, who brought up erections. He said it seemed like Clark was trying to "make his male performance seem spectacular, like he was well-gifted."

Parker could not recall any conversations between Patterson and Clark. Both Moye and Bishop said they had never heard Patterson make sexual comments and did not view her as flirty. Veler stated the prostate cancer/erection discussion was "more medical than anything." He further stated that Patterson was friendly, but not flirtatious.

The investigation team concluded that "Captain James Clark subjected SPO Mary Patterson to sexual harassment by creating an intimidating, hostile, and offensive work environment." The investigators further concluded that Clark had used his position to attempt to obtain sexual favors from an inexperienced female employee. The investigators found that Clark had pushed Patterson into an office and kissed her while uttering his sexual desires in the crudest of terms. Thereafter, he continued his unwanted attentions, and his actions adversely impacted Patterson to the point that she transferred off of his shift. The investigation team recommended to WSI senior management that

Clark be terminated. WSI's Senior Vice President and General Manager, John Burleson concurred, and Clark was terminated on October 6, 2009.

Plaintiffs' Amended Complaint "seeks redress for unlawful race and gender-based employment practices" in violation of Title VII of the Civil Rights Act ("Title VII") and the Tennessee Human Rights Act ("THRA"). Specifically, LaKeisha Clark has sued WSI for gender and race discrimination in her termination. James Clark has sued for race discrimination and retaliation.

Defendant moves for summary judgment stating there are no genuine issues of material fact as to any of Plaintiffs' claims and that Defendant is entitled to judgment thereon as a matter of law. Specifically, Defendant asserts: (1) the undisputed material evidence fails to establish the basis for Plaintiffs' claims; (2) James Clark failed to exhaust administrative remedies on his claims for race discrimination in training and retaliation in the denial of job assignments; (3) James Clark cannot establish a *prima facie* case of race based discrimination or retaliation in his termination and cannot establish that Defendant's articulated reasons are pretextual; (4) LaKeisha Clark cannot establish a *prima facie* case of race or gender discrimination in her termination and cannot establish that Defendant's articulated reasons for her termination are pretextual; (5) Plaintiffs' THRA claims are time barred by Tenn. Code Ann. § 4-21-311, and said claims should be dismissed for the same reasons that Plaintiffs' Title VII claims should be dismissed; and (6) any state "common law" claims are barred by the applicable statute of limitations.

## II.     Summary Judgment Standard

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that no genuine issues of material fact exist.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993).  All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317.  To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law.  *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder.  *Id.* at 250.  The Court does not weigh the evidence or determine the truth of the matter.  *Id.* at 249.  Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact."  *Street v. J.C. Bradford & Co.,* 886

17

F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## III.   Analysis

### A.   James Clark's Claims Pertaining to Training and Job Assignments

James Clark alleges that he was denied training due to his race and that he was retaliated against for challenging the denial of training. The retaliation consisted of "denying him work assignments" and "not providing him with an "Independent Development Plan." James Clark's only charge complaining about the denial of work assignments and training is his first EEOC charge filed on June 16, 2000. Clark admits that he did not include a retaliation claim in his charge filed February 17, 2010. He testified, "So I must have failed to put that in there then. Never even recognized that."

A Title VII plaintiff must exhaust administrative remedies before bringing suit in federal court. A claimant must first file an administrative charge with the EEOC. 42 U.S.C. § 2000e-5(e); *Abeita v. TransAmerica Mailings,* 159 F.3d 246, 252 (6th Cir. 1998). A charge of discrimination is sufficient if it contains "a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). The purpose of filing a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC so that the Commission may first attempt to obtain voluntary compliance with the law. *See EEOC v. The Bailey Co Inc.,* 563 F.2d 439, 447 (6th Cir. 1977). These investigatory and

18

conciliatory procedures notify potential defendants of the nature of plaintiffs' claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them. *Id.* The general rule in the Sixth Circuit is that the judicial complaint is limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination. *Davis v. Sodexho, Cumberland College Cafeteria,* 157 F.3d 460, 463 (6th Cir. 1998); *Ang v. Proctor & Gamble Co.,* 932 F.2d 540, 545 (6th Cir. 1991).

Here, the record reflects that Clark has failed to exhaust administrative remedies on his training, job assignment, and Independent Development Plan allegations. His 2010 charge on its face is limited to his termination in October 2009. Clark did not allege disparate treatment as to training, job assignments, or Independent Development Plan in his 2010 EEOC charge. Claims for disparate treatment relating to training do not arise from nor reasonably relate to the allegations of retaliatory termination alleged in the EEOC charge. An investigation of the termination would not reasonably be expected to uncover evidence of disparate treatment in training. Although courts will "liberally construe an administrative charge for exhaustion of remedies purposes, we also recognize that there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo,* a claim which simply was not made." *Cottrell v. MFA, Inc.,* 443 F.3d 629, 635 (8th Cir. 2006). Because the retaliatory discharge claim was not broad enough to encompass disparate treatment in training, job assignment, and Independent Development Plan claims, Plaintiff failed to exhaust his administrative remedies on these claims.

Moreover, the Court finds these claims are further barred by the doctrine of *res judicata*. Under *res judicata* or claim preclusion, "a final judgment on the merits bars any and all claims by the parties or their privies based on the same cause of action, as to every matter actually litigated, and as to every theory of recovery that could have been presented." *Watts v. Fed. Express Corp.,* 53 Fed. Appx. 333, 335 (6th Cir. 2002); *Migra v. Warren City Sch. Dist. Bd. Of Educ.,* 465 U.S. 75, 77 n. 1 (1984). Clark filed suit on October 22, 2001, relying on his first EEOC charge to meet the administrative prerequisite for the suit. Summary judgment was granted on July 12, 2007, and was affirmed by the Sixth Circuit Court of Appeals on July 25, 2008. Thus, any claims Clark could have presented stemming from his first EEOC charge, including discrimination in training, assignments, Independent Development Plan, and related promotions, are barred by claim preclusion. *See Wolfe v. Norfolk So. Ry. Co.,* 66 Fed. Appx. 532, 534 (6th Cir. 2003 (affirming summary judgment on plaintiff's claims that were identical to earlier claims dismissed with prejudice in another case). Accordingly, the Court finds that Defendant is entitled to summary judgment on James Clark's claims for discrimination in training, job assignments, and Independent Development Plan as a matter of law, and these claims will be **DISMISSED.**

### B. James Clark's Race Discrimination Claim

James Clark alleges that he was treated less favorably than similarly situated white males and/or females by WSI as evidenced by its investigation of the allegations against him and by its decision to terminate him

20

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminating against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff may satisfy his burden of establishing such discrimination either by presenting direct evidence of discriminatory actions by the defendant or by showing the existence of circumstantial evidence that creates an inference of discrimination.

Direct evidence, if believed, requires a conclusion by the fact-finder that unlawful discrimination was at least a "motivating factor" for the employer's actions. *See Wexler v. White's Fine Furniture Inc.,* 317 F.3d 564, 570 (6th Cir. 2003). In this case, Plaintiff does not offer any direct evidence of discrimination.

As Plaintiff does not offer any direct evidence of discrimination, he must rely on the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). As such, Plaintiff "bears the initial burden of demonstrating the *prima facie* elements of his Title VII claim. If he succeeds, this creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for taking the challenged employment action." *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 593 (6th Cir. 2007). Only if Defendant meets this obligation does the burden shift back to the Plaintiff to "then prove the proffered reason was actually a pretext to hide unlawful discrimination." *Id.*

To establish a *prima facie* case of race/gender discrimination, Plaintiff must demonstrate (1) that he is a member of a protected class; (2) that he suffered an adverse

21

employment action; (3) that he was qualified for the position; and (4) that a similarly-situated employee outside the protected class was treated more favorably. *Younis v. Pinnacle Airlines, Inc.,* 610 F.3d 359, 363 (6th Cir. 2010).

Once Defendant establishes a legitimate, non-discriminatory reason for Plaintiff's discharge, it becomes Plaintiff's burden to prove, by a preponderance of the evidence, that Defendant's reason for his termination is merely a pretext for race/gender discrimination. *Kocsis v. Multi-Care Mgmt. Inc.,* 97 F.3d 876, 883 (6th Cir. 1996). "More specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Id.* At this third step, a plaintiff is obligated to present evidence that (1) creates a question of material fact as to whether a defendant's proffered reasons are pretextual and (2) creates a reasonable inference that race/gender was a determinative factor in the adverse employment decision. *Forest v. Barnes Jewish Hosp.,* 2009 WL 877716 at *9 (E.D. Missouri 2009). A plaintiff may establish pretext by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the action, or (3) that the proffered reason was insufficient to motivate the action. *Kocsis,* 97 F.3d at 883. In sum, Plaintiff must provide sufficient evidence that would allow a reasonable jury to reject Defendant's reason for his termination and conclude that intentional, race/gender based discriminatory animus was its true motivation for terminating him. *See Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 148 (2000).

Here, it is undisputed that Clark can establish the first three prongs of the *prima facie* case, but the Court finds that he cannot establish the fourth. Clark contends that

22

Defendant treated a white male, SPO Scott West, better than Clark in similar circumstances. It is Plaintiff's burden to establish that the other employee's acts were of "comparable seriousness" to his own. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). To make this assessment, courts look at certain factors such as whether the individuals, "have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

The record shows that the claim against West arose out of a personal relationship with Andrea Reed that had ended. West continued to contact Reed after she told him to stop. Reed's harassment complaint was investigated by WSI. While West's actions were found to be inappropriate, WSI concluded that West had not engaged in a pervasive hostile work environment. Reed did not allege that West had touched her inappropriately, much less that he had kissed her against her will. She did not allege that West harassed her with sexually tinged remarks. In addition, West was Reed's co-worker and he was not using a supervisory position to extract sexual favors from her. WSI counseled West and Reed, placed them on separate shifts, and the matter was closed.

The allegations against Clark in this case include a claim of sexual harassment involving unwanted attention, and physically pushing Patterson into a room and forcibly kissing her while uttering a base description of what he wanted to do to her. More importantly, Clark's case is a matter of supervisory harassment, not co-worker

23

harassment, as was the case with West. The Court finds the two situations are not similar under the *Ercegovich* and *Mitchell* standard.

Nor can Clark show that the reason articulated by WSI for his termination is a pretext for race/gender discrimination. Defendant's proffered reason for Clark's termination is that after an investigation of Patterson's sexual harassment allegations, WSI found them to be fully credible. The investigators believed Patterson's version of the events and did not believe Clark's denials. Moreover, Clark's own witnesses did not support his version of events, but rather, supported Patterson's. Based on the evidence gathered by the investigation team, WSI concluded that Clark had violated its sexual harassment policy and terminated him.

Clark's argument that WSI intentionally "got it wrong" is not sufficient to rebut WSI's legitimate non-discriminatory reason for his termination. He cannot establish that, assuming the factual basis for WSI's actions were true and sufficient for discharge, Defendant's actions were more likely than not based on impermissible purposes. The Sixth Circuit Court of Appeals has adopted the "honest belief" rule with regard to an employer's proffered reason for discharging an employee:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. . . .

*Smith v. Chrysler Corp.,* 155 F.3d 799, 806-07 (6th Cir. 1998).

Applying these principles to the facts in the instant case, the Court finds that Defendant reasonably relied on the particularized facts at hand when it determined that

24

Clark had sexually harassed Patterson. The investigation committee received overwhelming evidence to support Patterson's claims. While Clark denies the accusations in the statements given by Patterson and his fellow employees, he cannot show that Defendant failed to reasonably inform itself of the situation surrounding the accusations against him before taking any adverse employment action. The Court finds that WSI management held an honest belief that Clark had violated its sexual harassment policy and Clark has not raised a genuine issue of material fact as to pretext. "If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." *Smith,* 155 F.3d at 806.

Clark attempts to establish pretext by arguing that his Employee Concern form filed after he was suspended and before he was terminated was never addressed by WSI. However, the record shows that the investigation team considered Clark's Employee Concern form as part of the overall investigation into Patterson's sexual harassment allegations. Brenda Curtis, Defendant's Human Resources Director, stated "we thoroughly investigated Patterson's allegations and Capt. Clark's defenses and counter allegations. There was no need for us to separately investigate the Employee Concern form." Curtis further stated that WSI "did not routinely offer or require polygraph examinations in workplace misconduct investigations, because it was difficult for females to report sexual harassment and to have witnesses cooperate in investigations without the cloud of being potentially subjected to a polygraph." Since the evidence shows that WSI

25

considered the allegations in Clark's Employee Concern form as part of its investigation, the Court finds Clark's argument without merit.

To establish pretext, Clark also relies upon a Tennessee Department of Employment Security Decision awarding him unemployment benefits after his termination. However, under Tennessee Code Annotated § 50-7-304(k), unemployment claims are not to be considered in any other action:

> No finding of fact or law, judgment, conclusion, or final order made with respect to a claim for unemployment compensation under this chapter may be conclusive in any separate or subsequent action or proceeding in another forum, except proceedings under this chapter, regardless of whether the prior action was between the same or related parties or involved the same facts.

The Sixth Circuit Court of Appeals has interpreted the Tennessee statute to mean that decisions of the Tennessee Department of Employment Security cannot be used in civil cases because they are the result of "quick and inexpensive hearings with different standards of proof than civil trials. As a result, an unemployment hearing officer's decision should not be admitted in an employment discrimination suit." *Fleming v. Sharp Mfg. Co. of Amer.*, 2012 WL 3049624 at \*5 (W.D. Tenn. Jul. 25, 2012); *see also Reed v. Intermodal Logistics Serv. LLC*, 2011 WL 4565450 (W.D. Tenn. Sept. 29, 2011); *Wright v. Columbia Sussex Corp.*, 2008 WL 972699 (E.D. Tenn. Apr. 7, 2008); *Pascual v. Anchor Advances Prods. Inc.*, 117 F.3d 1421 (6th Cir. 1997).

The Court finds that Plaintiff has failed to rebut WSI's legitimate non-discriminatory reason for his termination. Accordingly, Defendant is entitled to summary

judgment on Plaintiff's race/gender discrimination claims, and these claims will be **DISMISSED**.

### C. James Clark's Retaliation Claim

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate: (1) he engaged in a protected activity; (2) defendant was aware of the protected activity; (3) defendant subjected plaintiff to a materially adverse employment action; and (4) a causal connection exists between the protected activity and the materially adverse action. *Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008). Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action. *See Univ. of Texas Southwestern Medical Ctr. v. Nassar,* 133 S.Ct. 2517, 2533 (2013). If a plaintiff can establish a *prima facie* case and the defendant can satisfy its burden of showing a legitimate non-discriminatory reason, then a plaintiff may still prevail by demonstrating to the factfinder that the defendant's proffered reason is a mere pretext for intentional discrimination. *Ladd v. Grand Trunk W. R.R.,* 552 F.3d 495, 502 (6th Cir. 2009).

Defendant admits, for purposes of summary judgment, that Clark can establish the first three elements of a *prima facie* case, but argues that he cannot establish a causal connection between his protected activity and his termination. To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000). Where some time elapses between when the employer learns of

27

a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008).

The record shows that James Clark first engaged in protected activity in 2000 when he filed an EEOC charge, and again in 2001, when he sued WSI for race discrimination. That litigation was resolved against him in 2008, after a dismissal by this Court and a subsequent unsuccessful appeal. Clark filed another EEOC charge in 2007, alleging race discrimination in the denial of a promotion. Throughout his history of protected activity, the record shows that Clark received favorable reviews and pay increases from WSI. Clark was promoted to Captain in 2002. Clark was not terminated until October 6, 2009, well over a year after his lawsuit (the last of his protected activities) was dismissed.

Based on this record, the Court finds that no reasonable juror could conclude that Clark's protected activity, which ended upon the dismissal of his Title VII lawsuit in 2008, was causally related to the decision to either investigate or terminate him a year later. *See Freeman v. Ace Tel. Ass'n.,* 467 F.3d 695, 697-98 (8th Cir. 2006) ("The presence of intervening events may undermine any causal inference that a reasonable person might otherwise have drawn from temporal proximity").

Moreover, Defendant has articulated a legitimate non-retaliatory reason for terminating Clark – his sexual harassment of Patterson. As stated above, WSI engaged in a thorough investigation to determine whether Clark's conduct was inappropriate. Defendant interviewed eighteen (18) employees, including all of the employees named by

Clark as being witnesses favorable to him, and gave Clark every opportunity to rebut the charges against him. Clark has submitted no evidence indicating that WSI did not honestly believe Patterson and the other witnesses. The Court finds that Clark has failed to produce any evidence of a causal connection between his protected activity and his termination. Accordingly, the Court finds that Defendant is entitled to summary judgment on James Clark's claim for retaliation, and this claim will be **DISMISSED.**

### D. LaKeisha Clark's Race/Gender Discrimination Claims

LaKeisha Clark's discrimination charge is subject to the same legal standard discussed above. She must demonstrate (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the position; and (4) that a similarly-situated employee outside the protected class was treated more favorably. *Younis,* 610 F.3d at 363. If she establishes these four elements, the burden shifts to Defendant to proffer a legitimate non-discriminatory reason for its actions. If Defendant meets this burden, the ultimate burden of persuasion shifts back to Plaintiff to prove the articulated reason set forth by Defendant is a pretext for race/gender discrimination. *Kocsis,* 97 F.3d at 883.

It is undisputed, for the purposes of summary judgment, that LaKeisha Clark can establish the first three prongs of a *prima facie* case, but Defendant argues that she cannot establish that a similarly-situated employee outside the protected class was treated more favorably. She claims that she was wrongfully terminated "due to Defendant's failure to apply the same standard to her that it has applied in the past to other similarly situated employees that are white males or white females." To be similarly situated, Plaintiff

29

must introduce evidence that the comparators "have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352.

Clark identifies four white male comparators: David Grider, Darren Young, Joe Richards, and Justin Parker. Plaintiff testified that she heard through the grapevine that at some unknown time Grider and Garrett were in the gun room, where Grider said to a supervisor, "If you hand me that gun, I'm going to use it." Plaintiff cannot provide the context of the comment and there is no evidence it was reported to WSI management. According to Clark, the Young/Richards dispute involved "an exchange of words" between co-workers, and Richards was moved to another shift. She provides no specifics of what was said and by whom. As for the Parker incident, it occurred over a year after Clark was terminated and involved a different supervisor. In addition, Parker's hacky sack kicking infraction was determined to be horseplay involving no intent to threaten or cause harm, whereas Clark, a supervisor, angrily threatened to inflict serious bodily harm on a subordinate, Patterson. Violating a workplace violence policy is a legitimate non-discriminatory reason to terminate Clark. *See Smith v. Leggett Wire Co.,* 220 F.3d 752 (6th Cir. 2000) (threatening to kill co-workers is a legitimate non-discriminatory reason for firing the threatening employee). The Court finds that Plaintiff has failed to show that the alleged comparators were similarly situated to her as a matter of law and that Plaintiff has failed to establish pretext. Accordingly, her race and sex discrimination claims will be **DISMISSED.**

### E.    Plaintiffs' THRA Claims

Defendant argues that Plaintiffs' claims under the THRA for discrimination/retaliation should be dismissed because such claims are barred by the applicable statute of limitations.

The THRA has a one-year statute of limitations; thus, claims under that statute are to be filed within one year after the alleged discriminatory conduct ceased. Tenn. Code Ann. § 4-21-311(d). In addition, the THRA statute of limitations is not tolled while administrative charges are pending with the THRC or the EEOC. *Wade v. Knoxville Utilities Bd.,* 259 F3d. 452, 464 (6th Cir. 2001); *Martin v. Boeing Oak Ridge*, 244 F. Supp. 2d 863 (E.D. Tenn. 2003).

LaKeisha Clark was terminated on September 16, 2009, and James Clark was terminated on October 6, 2009. They did not file their lawsuit until February 21, 2012, well beyond the statute of limitations. Accordingly, the Court finds that Defendant is entitled to summary judgment on Plaintiffs' claims brought under the THRA and those claims will be **DISMISSED.**

### F.    Plaintiffs' Common Law Claims

Plaintiffs' Amended Complaint states that Plaintiffs are bringing an action under "common law." They generally allege that they have "endured undue emotional distress and mental anguish from the humiliation experienced as a result of Defendant's intentional acts … and negligent acts which has interfered with Plaintiffs' livelihood and with Plaintiffs' general welfare." To the extent Plaintiffs are asserting common law

claims for intentional or negligent infliction of emotional distress, those claims are subject to the one-year personal injury statute of limitations contained in Tenn. Code. Ann. § 28-3-104. *Feild v. Graffagnino,* 514 F. Supp. 2d 1036, 1043 (one-year statute of limitations applicable to personal tort actions alleging negligence and intentional infliction of emotional distress). As shown above, Plaintiffs were terminated in September and October 2009, but did not file suit until February 2012, well past the one-year statute of limitations. Accordingly, the Court finds that Defendant is entitled to summary judgment on Plaintiffs' claims for intentional and/or negligent infliction of emotional distress and those claims will be **DISMISSED.**

## IV. Conclusion

For the foregoing reasons, the Court hereby **GRANTS** Defendant's motion for summary judgment [Doc. 32] as to all of Plaintiffs' claims and this case is **DISMISSED**.

Enter:

_____
UNITED STATES DISTRICT JUDGE